**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 623 WDA 2024 |

Appeal from the Order Entered May 13, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000079-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 624 WDA 2024 |

Appeal from the Order Entered May 13, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000078-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 625 WDA 2024 |

Appeal from the Order Entered May 13, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000077-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

:
:
:
APPEAL OF: K.B., MOTHER       :
:
:
:
:
:    No. 626 WDA 2024

Appeal from the Order Entered May 13, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000076-2023

BEFORE: DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY DUBOW, J.:          **FILED: January 8, 2025**

Appellant, K.B. ("Mother"), appeals from the May 13, 2024 order entered in the Allegheny Court of Common Pleas that terminated her parental rights to ten-year-old K.X.B, seven-year-old K.T.B., and three-year-old twins K.M.B. and K.J.B (collectively, "Children").[1] Upon review, we affirm.

The Allegheny County of Children, Youth and Families (the "Agency") has been involved with this family since May of 2017 due to Mother's ongoing issues with drug and alcohol abuse. K.X.B. has been removed from Mother's care twice; most recently K.X.B. and K.T.B. (collectively, "Older Children") were adjudicated dependent in December of 2019. Older Children are currently placed in a pre-adoptive foster home, where they have been since February of 2022. K.M.B. and K.J.B. (collectively, "Twins") were adjudicated dependent in April of 2021, but remained in Mother's care. On November 25, 2021, the Agency removed Twins from Mother's care after she overdosed on

---

[1] The trial court also terminated the parental rights of Children's respective fathers. None of the fathers are a party to this appeal.

- 2 -

narcotics. The Agency placed Twins in pre-adoptive kinship care with their maternal aunt ("Maternal Aunt").

The court ordered Mother to maintain sobriety, obtain and maintain stable housing, participate in intimate partner violence ("IPV") counseling, participate in recommended mental health treatment, and visit with Children.

Mother has failed to maintain sobriety. The Agency made several referrals for Mother to receive drug and alcohol treatment. In the summer of 2020, Mother completed inpatient drug and alcohol treatment at POWER and moved to transitional housing where she attended outpatient treatment. In August of 2022, Mother completed a thirty-day drug and alcohol program through White Deer Run. In May of 2023, a month after the Agency filed petitions to terminate her parental rights, Mother entered inpatient drug and alcohol treatment at POWER and subsequently transitioned to a halfway house. Mother left treatment in September 2023. In December of 2023, Mother completed an assessment with POWER on December 21, 2023, and was referred to POWER New Day for drug and alcohol treatment. Mother accepted the referral but did not complete the program. Throughout the life of the case, the court required Mother to complete random urine screens; Mother participated in only 37 of 102 scheduled drug screens.

Mother declined to complete IPV counseling. The Agency made a referral to the Women's Center and Shelter for treatment on April 21, 2020, but Mother informed the Agency that she did not need IPV counseling, despite previously filing a protection from abuse petition against Twins' father.

Mother also failed to complete mental health treatment. However, Mother did participate in parenting capacity and bonding evaluations with Patricia Pepe, Ph.D.

In addition, Mother lacks appropriate housing. Mother became homeless in June of 2022 and the Agency referred her to Aria, a program that provides services to clients on the condition that they participate in drug and alcohol treatment. Mother entered a drug and alcohol treatment program in May of 2023, but left the program four months later prior to completion. The Agency had contact with Mother in December of 2023, and she reported that she was still homeless. The Agency made an additional referral to Aria at that time.

Finally, Mother inconsistently visits with Children. Mother is offered weekly supervised visitation with Children. A Second Chance supervises the visits with Older Children and has offered Mother a total of 96 visits throughout the life of the case, but Mother has only attended 22 visits with Older Children. The Agency supervises visitation between Mother and Twins and agreed to transport Twins to wherever Mother was located. The Agency scheduled 55 visits and Mother only attended 20 visits with Twins. Mother has not attended visits with Children since December 31, 2023.

On April 3, 2023, the Agency filed petitions to terminate Mother's parental rights to Children. The trial court appointed Leah Cox, Esq., to serve as legal counsel for Children. On April 26, 2024, the court held a hearing on the petitions. The Agency presented testimony from Grant Walker, an Agency

caseworker, as well as Dr. Pepe, who testified as an expert in forensic psychology. Mother failed to appear at the hearing.

The Agency's witnesses testified in accordance with the above-stated facts. In addition, Mr. Walker testified that the Agency provided transportation assistance to Mother throughout the life of the case, including giving her a public transportation pass, access to ride share services, and gas gift cards. Mr. Walker further testified that Mother only attended a couple of Children's medical appointments.

Mr. Walker testified that Older Children have been placed in a pre-adoptive foster home since February of 2022 and are both "happy, healthy, pretty bonded with their foster parents." N.T. Hearing, 4/26/24, at 20. He explained that Older Children participate in Cub Scouts, soccer, and trips with their foster parents. Mr. Walker informed the court that Older Children receive school-based counseling through their school and that the foster parents meet all of Older Children's needs. Mr. Walker testified that Older Children have been placed since July of 2019, or almost five years at the time of the hearing.

Mr. Walker informed the court that Twins are still placed in a pre-adoptive kinship care home with Maternal Aunt. Mr. Walker testified that Twins are happy and healthy, and that they are both involved in gymnastics and swimming. He explained that they receive early intervention services, including speech and developmental services. Mr. Walker testified that adoption is the appropriate permanency goal for Twins. He further testified

that Twins have been placed since November of 2021, or almost two-and-a-half years at the time of the hearing.

Finally, Mr. Walker testified that the Agency is recommending a termination of mother's parental rights to Children.

Dr. Pepe testified that she completed multiple evaluations of the family and issued four separate reports throughout the life of the case. Dr. Pepe testified that the first evaluation was conducted from March to October of 2021. At the time, Older Children were placed with their maternal grandmother, but Twins were still living with Mother. Dr. Pepe testified that, at the time, Mother was making an attempt to change her lifestyle and recommended that Mother maintain sobriety and that Twins remain in her care.

Dr. Pepe's second report is dated April 14, 2023. Dr. Pepe testified that, at that time, Mother was inconsistent with visits, had recently relapsed, was unemployed, was homeless, and had pending criminal charges. Dr. Pepe recommended that Mother participate in an intensive dual diagnosis treatment program. Dr. Pepe testified that Mother "did not present an ability to parent [C]hildren at that time." *Id.* at 42. Dr. Pepe further testified that Older Children did not view Mother as a "psychological parent" due to inconsistent contact. *Id.* Dr. Pepe explained that a "psychological parent" is "an individual that a child perceives as being able to meet their daily needs, somebody that's dependable, somebody that's available, somebody that would be readily caring towards the child, and someone that the child feels safe with. . . . So

it's basically who the child appears to view as their primary parent, the primary individual who is caring for them." *Id.* at 42-43. Dr. Pepe explained that Mother continued to struggle with housing, drug treatment, legal issues, and "all of those issues interferes with her ability to parent." *Id.* at 44. Dr. Pepe informed the court that Children were making "primary attachments to their respective caregivers[.]" *Id.*

Dr. Pepe testified regarding her August 15, 2023 report. She stated that, at that time, Twins "continued to exhibit multiple bonding behaviors suggestive of a primary attachment" to Maternal Aunt and "I would be concerned if [T]wins were removed from her care, that they could experience developmental and psychological and behavioral regression." *Id.* at 45. Dr. Pepe further testified that Older Children likewise "exhibited a primary attachment towards their foster parents." *Id.* at 46. Dr. Pepe explained that a "primary attachment" is "who the child perceives, for example, as a psychological parent, and who they feel a strong connection with, to the point that their sense of identity is very much involved with their bonding towards a primary parent figure." *Id.* at 47.

Finally, Dr. Pepe testified regarding her most recent April 25, 2024 report. Dr. Pepe testified that Twins refer to Maternal Aunt as "mommy" and "exhibited a primary attachment towards her." *Id.* at 47. Dr. Pepe testified that Older Children "are really exceptional little boys" who "are so pleasant and friendly and polite and are so very engaging." *Id.* at 48. Dr. Pepe further testified that Older Children "said they were very happy in their home and that

the foster parents take better care of them, including feeding them vegetables, and so the [Older C]hildren were very happy." ***Id.***

With regards to Mother's ability to parent, Dr. Pepe testified:

> I have always felt that [Mother] has had the ability to succeed. She certainly is knowledgeable, but she continues to sabotage herself over and over again. She's not able to maintain housing, she's not able to maintain sobriety for a significant period of time, and she often has criminal issues that she's dealing with, and I unfortunately believe because of her own personal instability, I don't see her as being able to viably be able to provide a home for [C]hildren, and at this point [C]hildren's primary attachment has changed to their current caregivers.

***Id.*** at 49-50.

Dr. Pepe opined that there would not be a negative impact on Children if Mother's parental rights were terminated. Dr. Pepe explained that Older Children "have learned – they don't rely on [Mother] anymore" and Twins have been living with Maternal Aunt for most of their lives. ***Id.*** at 50. Finally, Dr. Pepe testified that it would be "to the Children's benefit for them to remain permanently in their respective homes through adoption." ***Id.*** at 51.

On May 13, 2024, the trial court terminated Mother's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). Mother timely appealed. Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues for our review:

1. Did the trial court abuse its discretion an/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Children] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Br. at 12.

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the

evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." ***L.A.K.***, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. ***In re Adoption of A.C.***, 162 A.3d 1123, 1128 (Pa. Super. 2017). "Initially, the focus is on the conduct of the parent." ***Id.*** (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." ***Id.*** (citation omitted). If the court determines that the parent's conduct warrants termination of his or her

parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). With regards to Mother, we concentrate our analysis on Section 2511(a)(2).

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include "acts of refusal as well as incapacity to perform parental duties." *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of

services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *Id.* at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

In her first issue, Mother avers that the Agency failed to present clear and convincing evidence to terminate her parental rights pursuant to Section 2511(a)(2). Mother argues that she "successfully complet[ed]" various drug and alcohol programs with POWER and White Deer Run, received mental health treatment at POWER, maintained her sobriety, and demonstrated her ability to provide essential parental care to Children through positive interactions with them during visitation. Mother's Br. at 25-26. Mother's arguments merit no relief.

Mother mischaracterizes her accomplishments. While Mother may have completed inpatient drug and alcohol programs at POWER and White Deer Run, she failed to maintain her sobriety upon discharge as evidenced by her minimal compliance with random drug and alcohol screens throughout the life of the case, as well as multiple relapses precipitating the need for the Agency to continue to make numerous referrals for Mother to receive drug and alcohol

treatment. The record reveals that the most recent referral occurred in December of 2023, and Mother failed to re-enter treatment.

Moreover, the Agency presented evidence that Mother failed to complete mental health treatment, obtain appropriate housing, or attend court-ordered IPV counseling. Most concerning is Mother's inconsistent visitation with Children. The undisputed evidence demonstrated that Mother attended less than half of the visits with Children that were offered to her and has failed to visit with Children entirely since December of 2023. Finally, the Agency presented expert testimony from Dr. Pepe that Mother did not have the ability to parent Children. N.T. Hearing at 42.

Considering all of the evidence, and applying the legal principles discussed above, the trial court found that Mother was incapable of completing her court-ordered goals rendering her unable to parent, and that her continued incapacity has caused Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. The court opined:

> In the case before us, the issue is less that Mother refused to meet her goals, and more that she struggled to complete them over the life of this case. Her incapacity to complete her court-ordered goals did not support the goal of reunification nor did it show that she had a commitment to her children. She expressed to both the psychologist and the caseworker that she had a willingness to improve. However, no amount of improvement matters if a parent cannot achieve the capacity to adequately parent their children. This insufficiency is viewed in the same light as a refusal or, in this case, failure to provide essential parental care because a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

- 13 -

Trial Ct. Op., dated 6/27/24, at 17 (unpaginated).

Our review of the record supports the trial court's findings. We decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we discern no abuse of discretion in the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(a)(2).

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the

- 14 -

love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d at 103. Ultimately, the concern is the needs and welfare of the child. *Z.P.*, 994 A.2d at 1121.

Mother avers that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(b). Mother's Br. at 27. Mother argues that Dr. Pepe testified that she observed positive interactions between Mother and Children and that Older Children had a positive attachment to Mother. *Id.* at 28. Mother further argues that she loves Children and that a termination of her parental rights is not in Children's best interest. *Id.* at 29.

Upon review, the trial court did not abuse its discretion when it found that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(b). Mr. Walker testified that Children are doing very well in their respective pre-adoptive foster and kinship homes and that adoption was the appropriate permanency goal for Children. Moreover, Dr. Pepe provided undisputed expert testimony that Children exhibited a "primary attachment" to their current caretakers, that Children would not suffer irreparable emotional harm if Mother's parental rights were terminated, and that Children would "benefit" from adoption. N.T. Hearing at 50-51. As the record supports the trial court's findings that a termination of parental rights is in Children's best interest, we discern no abuse of discretion.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  1/8/2025